UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DONNETTA SMITH,
CHARLES SMITH, and
LOGAN SMITH,

                Plaintiffs,                        Case No.  1:11-CV-390

v.                                        HON. GORDON J. QUIST

CITY OF STURGIS,
MARK STONEBURNER, individually
and in his official capacity as a police
officer for the City of Sturgis, and
DAMON KNAPP, individually
and in his official capacity as a police
officer for the City of Sturgis,

                Defendants.

_____/

## OPINION

       Plaintiffs, Donnetta Smith, Charles Smith, and Logan Smith (collectively the Smiths), have sued Defendants, the City of Sturgis (City) and City of Sturgis Police Officers Mark Stoneburner and Damon Knapp, alleging claims under 42 U.S.C. § 1983 for violations of their Fourth Amendment rights.  In addition, Donnetta and Charles Smith allege state-law claims for assault and battery, false arrest, and false imprisonment.

       Defendants have moved for summary judgment as to all claims.  The Smiths move for summary judgment on: (1) their second unlawful entry claim against Officer Stoneburner based on Officer Stoneburner's act of entering the Smiths' home to grab Charles; (2) Charles' and Donnetta's excessive force claims against Officer Stoneburner; and (3) Charles' and Donnetta's state-law claims against Officer Stoneburner for assault and battery, false arrest, and false imprisonment.  Although

the Smiths have requested oral argument, the Court concludes that the parties have adequately briefed the issues and oral argument will not further assist the Court.

For the following reasons, the Court will deny Defendants' motion. The Court will grant The Smiths' motion with regard to the second unlawful entry claim and deny it with regard to all other claims.

## I. Facts

The following facts are largely undisputed. Disputed facts, where material, will be discussed as they pertain to the Court's analysis of the claims.

On May 25, 2010, Officers Stoneburner and Knapp were riding on patrol together when they received a call from St. Joseph County Central Dispatch asking them to respond to a retail fraud complaint from the Walgreen's store in Sturgis, Michigan. The dispatcher reported that the suspect, later identified as Charles Smith, was still present at the store and was being cooperative.

When the officers arrived at the Walgreen's store, Charles was gone. The store manager informed the officers that he had observed Charles come into the store, walk to the cell phone products section, and plug his cell phone into various charging adapters to see if they fit his phone. The manager said that Charles then got a grocery cart, put a charging adapter package in the cart, and proceeded to walk around the store. A short time later, a clerk saw Charles leaving the store without the package and notified the manager, who stopped Charles and asked him about the phone charger. Charles showed the manager where he had left the cell phone charger package and picked it up. The manager grabbed the package from Charles and noticed that the package had been opened and the end of the adapter had been cut off. Charles identified himself and offered to allow the manager to search him. The manager declined, however, because he wanted to wait for the police to arrive. Charles initially agreed to wait for the police but left before they arrived. The manager

told the officers that Charles walked to a nearby house located at 706 S. Orange Street, which was visible from the store.

After completing their investigation at Walgreen's, Officers Stoneburner and Knapp proceeded to 706 S. Orange Street, where Charles resided with his mother, Donnetta, and brother, Logan, to do a "knock and talk."  When the officers arrived, Logan was in the front yard, and he approached the patrol car.  While still in the car, Officer Stoneburner asked Logan if he knew Charles Smith and whether Charles Smith lived there.  Logan responded that Charles was his brother, but he did not know whether Charles was home.  Logan asked Officer Stoneburner whether he should get Charles, but Officer Stoneburner responded that Logan need not bother and that he would get Charles himself.

The officers exited their patrol car and followed Logan as he walked to the east deck of the house.  Officer Stoneburner followed Logan into the house, while officer Knapp remained outside on the deck.  Logan went upstairs to Charles' room and returned with Charles less than a minute later.[1]  Officer Stoneburner asked Charles, who was dressed only in shorts, to step onto the deck to talk about what happened at Walgreen's.  Charles agreed to the request, and he and Officer Stoneburner stepped outside onto the deck.  Logan and Donnetta, who had come out of her bedroom, followed them outside shortly thereafter.

On the deck, Officer Stoneburner asked Charles about the Walgreen's incident, and Charles denied cutting the phone charger or taking anything from the store.  Officer Stoneburner then asked Charles if he could search Charles, and Charles consented to the request.  The pat-down search revealed nothing on Charles' person other than a lighter.  Officer Stoneburner then asked Charles

---

[1] A dispute of fact exists as to how far Officer Stoneburner proceeded inside the house. Officer Stoneburner testified that he stopped in the kitchen and waited while Logan went upstairs to get Charles, (Stoneburner Dep. at 31), while Logan testified that Officer Stoneburner followed him into the living room and then to the hallway upstairs just outside of Charles' room.  (Logan Smith Dep. at 11-13.)  The dispute is immaterial for purposes of the instant motions.

if he could look in Charles' bedroom. Charles mumbled something inaudibly in response to Officer Stoneburner's request and started walking toward the door. Officer Stoneburner followed Charles, asking him whether he had anything in his room the officers should know about. Charles opened the door and walked inside the house, and as Officer Stoneburner started to enter, Charles suddenly attempted to close the door to prevent Officer Stoneburner from entering. Officer Stoneburner used his hand to hold the door open, reached inside the house, grabbed Charles by the wrist, and told him to "stop." As Officer Stoneburner was reaching for Charles, Donnetta attempted to step in front of Officer Stoneburner as she yelled at Officer Stoneburner not to touch her son. As a result, Officer Stoneburner bumped Donnetta, causing her to hit the side of the house.

Officer Stoneburner pulled Charles out onto the deck and bent him over the railing, while Donnetta continued screaming at Officer Stoneburner not to grab her son. Although Charles initially did not resist, he began saying that he was "not going." At that point, Officer Knapp told Charles that he was under arrest. Charles stiffened his body and resisted the officers' attempts to place his hands behind his back. Officers Stoneburner and Knapp each grabbed one of Charles' arms and bent Charles over the railing, and pressed his head against the garage, which was next to the railing, as they handcuffed Charles. Officer Stoneburner then led Charles to the patrol car. Charles later complained to Officer Stoneburner that the handcuffs were too tight.

Subsequently, Officer Stoneburner charged Charles with the misdemeanor offense of third degree retail fraud. Charles later pled guilty to disturbing the peace.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty*

4

*Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

Because the parties have filed cross-motions for summary judgment, "the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).

### III. DISCUSSION

The Smiths' complaint contains three counts. The first, Count I, is captioned "42 U.S.C. § 1983 – Unconstitutional Search, Seizure, Arrest and Excessive Force – Individual Defendant Officers." Count II alleges claims against the City under § 1983[2] for failure to train as a result of an unconstitutional policy, custom, or practice. Finally, Count III alleges state-law claims against Officers Stoneburner and Knapp.

In their motion for summary judgment, Defendants noted that because the Smiths lumped all of their federal constitutional claims into a single count, Defendants could not determine the precise nature of the Smiths' claims. Accordingly, Defendants covered the universe of potential Fourth Amendment claims in their motion. In their response, however, the Smiths narrowed the scope of their claims and clarified the precise claims at issue. First, the Smiths assert two claims against Officer Stoneburner for unlawful entry into their home in violation of the Fourth

---

[2] Count II erroneously references 42 U.S.C. § 1988 as the basis for the claim against the City.

Amendment – the first based on the initial entry when Officer Stoneburner followed Logan into the house; and the second based on Officer Stoneburner's act of reaching into the house to grab Charles as Charles attempted to close the door.  Second, Charles asserts an excessive force claim against Officers Stoneburner and Knapp for the force they used in effecting the arrest.  Finally, Donnetta asserts an excessive force claim against Officer Stoneburner.  The Smiths have also clarified that they do not oppose dismissal of their claim against Officer Knapp for failing to intervene to stop Officer Stoneburner's unlawful entries, nor do they oppose the dismissal of their claim against the City.  In addition, the Smiths state that Charles is not alleging a claim for unlawful arrest, as they concede that the officers had probable cause to arrest Charles.  Therefore, the Court will limit its Fourth Amendment analysis to the two unlawful entry and two excessive force claims.

**A.      Federal Constitutional Claims**

**1.      Qualified Immunity**

Defendants assert the defense of qualified immunity as a basis for summary judgment on all of the Smiths' federal constitutional claims.  As the Sixth Circuit has recently observed:

> Once a defendant raises qualified immunity, "the burden is on the plaintiff to demonstrate that the official [is] not entitled to qualified immunity," *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006), by alleging "facts sufficient to indicate that the [government official's] act in question violated clearly established law at the time act was committed," *Russo v. City of Cincinnati*, 953 F.2d 1036, 1043 (6th Cir. 1992).  To defeat the qualified immunity bar, a plaintiff "must present evidence sufficient to create a genuine issue as to whether the defendant committed the acts that violated the law." *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994).

*Simmonds v. Genesee Cnty.*, 682 F.3d 438, 444 (6th Cir. 2012).

Qualified immunity shields "[g]overnment officials performing discretionary functions" from liability for civil damages "as long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Poe v. Haydon*, 853 F.2d 418, 423 (6th Cir. 1988) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct.

2727, 2735 (1982)). The affirmative defense of qualified immunity provides immunity from suit and not only as to liability. *See Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009).

A qualified immunity analysis involves a two-step inquiry. First, the court asks whether the facts, viewed in the light most favorable to the plaintiff, show a violation of a constitutional right. Second, the court asks whether the right at issue was "clearly established" at the time of the alleged misconduct. *See Cochran v. Gilliam*, 656 F.3d 300, 306 (6th Cir. 2011) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001)). A court may consider these inquiries in either order. *See id.* at 306.

To be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007) (internal quotation marks omitted). In other words, the law must be sufficiently clear that a reasonable officer would be on notice that his conduct is clearly unlawful. *Saucier*, 533 U.S. at 202, 121 S. Ct. at 2156. "[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (citing *Hope v. Pelzer*, 536 U.S. 730, 742-43, 122 S. Ct. 2508, 2516-17 (2002)).

**2.    Unlawful Entries and Arrest**

It is well-established that searches or seizures conducted in a private residence without a warrant are, in general, presumptively unreasonable. *See Payton v. New York*, 445 U.S. 573, 585, 100 S. Ct. 1371, 1379 (1980) (noting that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed" (internal quotation marks omitted)). Unless one of the limited exceptions to the warrant requirement applies, police officers may not enter an individual's home without a warrant supported by probable cause. *Kirk v. Louisiana*, 536 U.S. 635,

7

638, 122 S. Ct. 2458, 2459 (2002) (per curiam). "Exigent circumstances" is one of the well-recognized exceptions to the warrant requirement. "Exigent circumstances are situations where real immediate and serious consequences will certainly occur if the police officer postpones action to obtain a warrant." *Thacker v. City of Columbus*, 328 F.3d 244, 253 (6th Cir. 2003) (internal quotation marks omitted). Four of the well-recognized exceptions to the warrant requirement are: (1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) the need to prevent a subject's escape; and (4) risk of danger to the police or others. *See United States v. Williams*, 354 F.3d 497, 503 (6th Cir. 2003). Consent is another exception. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-44 (1973). A person may freely and voluntarily waive his Fourth Amendment rights by consenting to a search. *See Davis v. United States*, 328 U.S. 582, 593-94, 66 S. Ct. 1256, 1261-62 (1946). Consent must be freely and voluntarily given, and it "'may be in the form of words, gesture, or conduct.'" *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (quoting *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976)).

### *First Entry*

The Smiths' first claim is that Officer Stoneburner unlawfully entered their home in violation of the Fourth Amendment when he followed Logan inside, as Logan went to get Charles. Officer Stoneburner asserts that he is entitled to summary judgment on this claim because Logan, a resident of the home, consented to the entry. "Consent must be proved by clear and positive testimony and must be unequivocal, specific, and intelligently given, uncontaminated by any duress and coercion." *United States v. Williams*, 754 F.2d 672, 674-75 (6th Cir. 1985); *see also United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir. 1977) (noting that consent "'must be unequivocal, specific and intelligently given, uncontaminated by any duress or coercion'" (quoting *Simmons v. Bomar*, 349 F.2d 365, 366 (6th Cir. 1965) (per curiam)). The government bears the burden of demonstrating

8

consent, *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011), the existence of which is a question of fact to be decided from the totality of the circumstances.  *Schneckloth*, 412 U.S. at 227, 93 S. Ct. at 2048.

Officer Stoneburner argues that he is entitled to summary judgment because Logan's actions demonstrated his consent to the entry.  Officer Stoneburner notes that:  (1) both he and Officer Knapp testified that they did not hear what Logan was saying as they followed him from their patrol car to the house; (2) Officer Knapp testified that it appeared to him that Logan held the door open for Officer Stoneburner; (3) Officer Stoneburner testified that he simply followed Logan into the house; and (4) Logan testified that he did not say anything to Officer Stoneburner as he followed Logan into the house.  (Defs.' Br. Supp. Mot. at 9.)  On the other hand, Logan testified that as he spoke to Officer Stoneburner at the patrol car, he told Officer Stoneburner that he did not know whether Officer Stoneburner could come inside the house, stating, "Meet me around back on the deck, I'll have to ask my mom."  (Logan Smith Dep. at 10.)  Logan further testified that he told Officer Knapp that the officers could wait on the porch while he went inside to get Charles.  (*Id.*)  Logan also stated that as he went to shut the door, "Officer Stoneburner decided he was going to come in anyways," prompting Logan to give Officer Stoneburner a disapproving look.  (*Id.* at 11.)  In light of Logan's testimony, a genuine dispute of material fact remains as to whether Logan gave consent to the entry.  If a jury accepts Logan's testimony that he told Officer Stoneburner to wait on the deck while he went inside, Logan's subsequent actions could not establish consent because they would be, at best, equivocal in light of his statement that the officers should wait outside.  Moreover, the fact that Officer Knapp – who was serving as Officer Stoneburner's field training officer – stayed outside on the deck is relevant as to whether Officer Knapp understood that Logan had not given consent.  Thus, the Smiths have presented sufficient evidence to establish a Fourth Amendment violation.

As the cases cited above indicate, the law was clearly established as of May 25, 2010, that police officers violate the Fourth Amendment when they enter a residence without a warrant and the circumstances do not establish an exception to the warrant requirement. *Payton*, *supra*. Officer Stoneburner argues, however, that he is entitled to qualified immunity because he reasonably, although mistakenly, believed that Logan had given consent. Qualified immunity extends to government officials' objectively reasonable mistakes, "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009) (internal quotation marks omitted). But even if Officer Stoneburner mistakenly believed that Logan consented, such mistake would not be objectively reasonable if the evidence is construed in the light most favorable to the Smiths. Logan testified that he told the officers that they could wait on the deck, and nothing in his actions suggests anything to the contrary. Moreover, the fact that Officer Knapp remained on the deck could be construed by the jury that any alleged mistake by Officer Stoneburner was not objectively reasonable.

### Second Entry

The Smiths also claim that Officer Stoneburner violated their Fourth Amendment rights when he reached into the house and grabbed Charles.[3] This claim encompasses two facets: (1) an unlawful entry into the residence without a warrant; and (2) the in-home arrest of Charles without a warrant. The Smiths contend that they are entitled to summary judgment on this claim because the facts, viewed in a light most favorable to Officer Stoneburner, show that he violated the Smiths' clearly established rights by entering their house without a warrant or exigent circumstances. *See Payton*, 445 U.S. at 590, 100 S. Ct. at 1382 ("In terms that apply equally to seizures of property and

---

[3] The Smiths argue that Officer Stoneburner's illegal entry violated Donnetta's and Logan's Fourth Amendment rights as well as Charles' rights. Officer Stoneburner does not dispute that an illegal entry would violate Donnetta's and Logan's rights because they resided at the house.

to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."). Officer Stoneburner contends that he is entitled to summary judgment because the "hot pursuit" exception to the warrant requirement articulated in *United States v. Santana*, 427 U.S. 38, 96 S. Ct. 2406 (1976), applies in this case.[4]

Initially, the Court addresses Officer Stoneburner's assertion in his brief in response to the Smiths' motion that "the undisputed facts of this case establish that Stoneburner was in threshold [sic] of the doorway when he arrested Charles Smith." (Defs.' Resp. Br. at 5.)  Apart from the fact that Officer Stoneburner cites no record evidence supporting this assertion, it is contrary to the statements in Officer Stoneburner's admission in his moving brief that he "testified that he put his hand out to stop the door with one hand and reached *in* and grabbed Charles' wrist with the other hand." (Defs.' Br. Supp. at 6 (italics added).)  In fact, Officer Stoneburner admitted in his moving brief that "Charles [had] entered the house and attempted to shut the door on Stoneburner" and argued that "*Santana* gave Stoneburner the constitutional authority to *enter* the house to effectuate the arrest." (*Id.* at 11 (italics added).)  Moreover, the record evidence refutes Officer Stoneburner's assertion – it is undisputed that Charles was inside the house and Officer Stoneburner reached across the threshold and into the house to grab Charles.  (Stoneburner Dep. at 37 ("And as soon as he gets in the door and I'm leaning in to take a step into the door, the door begins to close."), 38 ("I merely just kind of reached around and grabbed his hand."), 79 ("He shut the door while I was walking into it."); Incident Report at 4 ("He opened the door and entered the residence and began to close the door as if to shut me out.  I reached in and grabbed onto his wrist."); Charles Smith Dep. at 27 ("So I had walked in.  And as I got into the house, I turned around and went to shut the door."), 29

---

[4] Although the Smiths address several other exceptions to the warrant requirement in their moving brief, the Court need not consider those exceptions because it appears that Officer Stoneburner relies solely on the hot pursuit exception.

(stating that "I was still inside the house when he grabbed me . . . .").) Moreover, as a matter of common sense, if Charles was inside the house and attempted to shut the door to prevent Officer Stoneburner from entering, and Officer Stoneburner stopped the door from closing and grabbed Charles by the wrist, he would have had to reach into the house to grab Charles by the wrist.

The only question, then, is whether the "hot pursuit" exception applies. In *United States v. Santana*, 427 U.S. 38, 96 S. Ct. 2406 (1976), the Supreme Court held that police officers had the right to enter the defendant's house to arrest the defendant when she retreated inside in order to thwart the arrest. An undercover police officer had arranged a drug purchase from the defendant, Santana, through another individual, McCafferty, using previously-recorded funds. Following the purchase, officers arrested McCafferty and returned to Santana's house, where the transaction occurred, to arrest Santana. The officers pulled up in front of Santana's house and saw her standing in the doorway. The officers exited their vehicle, shouted "police", and flashed their badges. At that point, Santana retreated into the vestibule of her house and the officers followed her inside to arrest her. *See id.* at 40-41, 96 S Ct. at 2408-09. In upholding the officers' warrantless entry into Santana's house, the Court observed that the officers had probable cause to arrest Santana and could have arrested her as she stood in her doorway, exposed to public view. *See id.* at 42, 96 S. Ct. at 2409. The Court concluded that under *Warden v. Hayden*, 387 U.S. 294, 87 S. Ct. 1642 (1967), Santana could not thwart the arrest by retreating into her house. The Court noted that while "'hot pursuit' means some sort of a chase," and that the pursuit in that case was not extended, as it "ended almost as soon as it began," the officers' chase still evoked the "hot pursuit" exception because any delay in effecting the arrest likely would have led to the destruction of evidence. *Id.* at 42-43, 96 S. Ct. at 2410. Thus, the Court held, "a suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place." *Id.* at 43, 96 S. Ct. at 2410.

Officer Stoneburner contends that the "hot pursuit" exception applies because the officers had probable cause to arrest Charles for the misdemeanor offense of retail fraud and Officer Stoneburner was following Charles when Charles entered the house and attempted to shut the door on Officer Stoneburner. The Smiths contend that Officer Stoneburner's reliance on the "hot pursuit" exception fails because the exception is limited to fleeing felony suspects and because Officer Stoneburner was not attempting to arrest Charles when Charles entered the house.

In *Welsh v. Wisconsin*, 466 U.S. 740, 104 S. Ct. 2091 (1984), the Supreme Court considered whether the Fourth Amendment permits warrantless in-home arrests for minor offenses under the "hot pursuit" exception. The officers in *Welsh* had entered the defendant's home for a nonjailable traffic offense after the defendant drove his vehicle off the road and walked home. The Court stopped short of holding that a misdemeanor offense can never justify a warrantless entry under the "hot pursuit" exception, but it "note[d] that it is difficult to conceive of a warrantless home arrest that would not be unreasonable under the Fourth Amendment when the underlying offense is extremely minor." *Id.* at 753, 104 S. Ct. at 2099. The Court further stated that "although no exigency is created simply because there is probable cause to believe that a serious crime has been committed, application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense, such as the kind at issue in this case, has been committed." *Id. See also LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 956 (9th Cir. 2000) (citing *Welsh* and noting that "the Supreme Court has explained that an exigency related to a misdemeanor will seldom, if ever, justify a warrantless entry into the home"); *Clark v. Henninger*, No. 99-3071, 2000 WL 968044, at *4 (7th Cir. July 11, 2000) ("More troublesome here is that the arrest involved the warrantless entry into a home for misdemeanor charges, and the Supreme Court's decision in *Welsh* casts considerable doubt on the reasonableness of such an entry."). Thus, while *Welsh* does not foreclose warrantless in-home arrests of individuals

suspected of minor offenses, in such cases the "presumption of unreasonableness [will be] difficult to rebut." *Welsh*, 466 U.S. at 750, 104 S. Ct. at 2098.

Even though the "hot pursuit" exception is not foreclosed in cases involving misdemeanors, *see United States v. Johnson*, 106 F. App'x 363, 367 (6th Cir. 2004) (observing that the Supreme Court "has not completely foreclosed the possibility that [warrantless] entries may be made to search for misdemeanants"), Officer Stoneburner has failed to identify any circumstance, apart from probable cause for the underlying retail fraud misdemeanor, that could overcome the strong presumption that his entry inside the Smiths' residence to arrest Charles for third degree retail fraud was unreasonable. Moreover, as the Court noted in *Welsh*, an exigency does not exist simply because there is probable cause to believe that a person has committed even a serious crime. *Welsh*, 466 U.S. at 753, 104 S. Ct. at 2099. In this regard, Officer Stoneburner's reliance on *Johnson*, *supra*, in which the Sixth Circuit held that exigent circumstances justified a warrantless entry to effect an arrest for a misdemeanor offense, is misplaced. The court held that exigent circumstances justified the entry because after firing a shotgun from his porch and being alerted to the presence of police officers, the defendant fled into his house. The court concluded that the entry was justified because the police had been informed that there were children in the house and they had no idea if the shooter lived there, whether he was dangerous, and who else was inside. *Johnson*, 106 F. App'x at 367-68. There are no similar, or even remotely analogous, circumstances in the instant case to those in *Johnson*.

Aside from the lack of exigent circumstances, the "hot pursuit" exception simply does not apply because, although he had probable cause to arrest Charles, Officer Stoneburner had not initiated an arrest of Charles, nor was Officer Stoneburner chasing Charles. *See Knowles v. City of Benicia*, 785 F. Supp. 2d 936, 945 (E.D. Cal. 2011) ("As the name ["hot pursuit"] implies, there also

must actually be a chase."); *Swofford v. Eslinger*, 671 F. Supp. 2d 1289 (M.D. Fla. 2009) (holding that the defendant officers were not in pursuit of two suspects at the time they entered the plaintiff's property, as more than eleven minutes had passed since the time one of the officers lost sight of the suspects). While on the deck, neither officer advised Charles that he was under arrest, and Officer Stoneburner testified that he was following Charles inside the house to continue his investigation. (Stoneburner Dep. at 51.) In sum, nothing in the record indicates that Officer Stoneburner was chasing Charles. Therefore, there is no genuine dispute of fact that Officer Stoneburner's warrantless entry violated the Smiths' Fourth Amendment rights.

The remaining issue is whether the law was clearly established such that a reasonable police officer in Officer Stoneburner's position would have known that the entry was unlawful. *See Cummings v. City of Akron*, 418 F.3d 676, 685-87 (6th Cir. 2005) (holding that the defendant police officer violated the plaintiff's clearly established Fourth Amendment rights by entering the plaintiff's home without a warrant in the face of the plaintiff's efforts to shut his door to prevent the officers from entering). In light of the cases cited above, the Court must conclude that the law was sufficiently clear that a reasonable police officer would have known that the Fourth Amendment prohibited him from entering the Smiths' residence to seize Charles because there were no exigent circumstances. Accordingly, Officer Stoneburner is not entitled to qualified immunity, and the Smiths are entitled to summary judgment on this claim.

### 3. Excessive Force

Charles claims that Officers Stoneburner and Knapp used excessive force when they arrested him and placed him in handcuffs on the deck and that Officer Stoneburner used excessive force by refusing to loosen the handcuffs after Charles complained that they were too tight. Donnetta claims that Officer Stoneburner used excessive force when he pushed her as she stepped in front of him.

An excessive force claim must be analyzed under the Fourth Amendment's standard of objective reasonableness. *Graham v. Connor*, 490 U.S. 386, 395-96, 109 S. Ct. 1865, 1871 (1989). This standard must be applied in light of the reality that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 397, 109 S. Ct. at 1872. Thus, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396, 109 S. Ct. at 1872. In determining whether an officer's actions were reasonable, a court must examine the specific facts of the case. *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (2001) (citing *Graham*). Factors that bear on the issue are: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect is cooperating or is actively resisting arrest or attempting to flee. *Id.*

The Court first addresses Charles' and Donnetta's argument in support of summary judgment that because Officer Stoneburner violated their Fourth Amendment rights by entering the house and seizing Charles, the officers' use of any force against either of them should be deemed unconstitutional, as no force was required. The case they cite, *Cox v. Treadway*, 75 F.3d 230 (6th Cir. 1996), does not support this proposition. The plaintiffs in *Cox* alleged that the defendant police officers used excessive force in arresting them, but there was no claim that the arrests were unlawful. In fact, the court recognized that the arrests were lawful and that the officers were entitled to use some force in effecting the arrests. The plaintiffs claimed, however, that the officers violated the Fourth Amendment by using force against them after they had been restrained. In fact, the issue addressed in the portion of the opinion that Charles and Donnetta cite concerned the sufficiency of the district court's instruction regarding use of force in post-restraint situations. *See id.* at 234-35.

The instant case, of course, does not involve  the use of force post-restraint.[5]

Even as to unlawful arrests, however, to this Court's knowledge, the Sixth Circuit has never held that an unlawful arrest *ipso facto* renders the use of any force excessive.  A Sixth Circuit panel acknowledged the argument in *Young v. Barrett*, No. 89-6218, 1990 WL 124206, at *5 (6th Cir. Aug. 27, 1990) (per curiam), but it declined to adopt such a rule, holding instead that a question of material fact remained as to whether the force used by the defendant was unreasonable.  In light of this decision the Court will analyze the excessive force claims for reasonableness as required by *Graham*.

### *Charles' Claim*

Charles alleges that officers Stoneburner and Knapp used excessive force on him when they banged his head on the side of the garage several times as they held him against the deck railing and handcuffed him.  (Charles Smith Dep. at 30-34; Logan Smith Dep. at 20-23; Donnetta Smith Dep. at 46-48.)  Defendants contend that they are entitled to summary judgment because their use of force was minimal and reasonable under the circumstances.  They note that they reasonably interpreted Charles' attempts to straighten up from being bent over the railing as resistance and their use of force to push Charles back against the garage when he tried to straighten up was reasonable.  Charles, in fact, testified that after Officer Stoneburner bent him over the railing, he attempted to straighten his body in order to breathe, but the officers kept pushing him back down, causing his head to hit the garage.  (Charles Smith Dep. at 32-33.)

In light of the circumstances surrounding the arrest, the Court concludes that an issue of fact remains as to whether the officers' use of force was reasonable.  First, the offense for which the

---

[5]Charles and Donnetta also fail to note that the portion of the *Cox* opinion they cite was not the court's opinion with regard to the jury instruction issue.  The concurring opinion of Judge Ryan, in which Judge Batchelder concurred, held that even in the post-restraint situations, the use of force should still be analyzed under the *Graham* reasonableness test.  *See Cox*, 75 F.3d at 232, 241-42.

officers had probable cause – third degree retail fraud – is not a violent crime, nor did the circumstances of the alleged crime indicate that Charles used any degree of violence in committing the offense.  Second, there is no indication that Charles posed a threat to the officers.  Charles was wearing only shorts, and the officers knew that Charles did not possess any weapons because Officer Stoneburner had just searched Charles.  Third, while the officers could reasonably interpret Charles' attempts to straighten his body as resistance, the physical differences between Charles and the officers renders the officers' use of force questionable.  Charles is 5'4" tall and weighed about 120 pounds at the time of the incident.  On the other hand, Officer Stoneburner is 5'9" and weighed 170 pounds and Officer Knapp is 5'11" and weighed about 255 pounds.  Even if some force was necessary, given that Officers Stoneburner and Knapp outweighed Charles by a collective 185 pounds, the officers' acts of slamming Charles' head into the garage multiple times suggests that the degree of force they used was unnecessary, especially once the officers physically controlled Charles.  *Cf. Eberle v. City of Newton*, 289 F. Supp. 2d 1269, 1279 (D. Kan. 2003) ("[I]t must be borne in mind that Eberle presented no danger to the officers.  She was in an interrogation with two officers.  It is uncontroverted that McMichael outweighs Eberle by nearly 50 pounds, and the videotape suggests that the second officer is also substantially built.").  Finally, as set forth above, the arrest itself was unlawful because Officer Stoneburner pulled Charles from inside his house to effect an arrest, which, according to *Young*, *supra*, is an additional factor bearing on whether the force was reasonable.

The Court further concludes that Officers Stoneburner and Knapp are not entitled to qualified immunity because the amount of force they used was objectively unreasonable.  As noted, the offense at issue was a minor, nonviolent offense.  Charles posed no risk to the officers' safety, and there is no indication that either officer alone, let alone both of them, could not sufficiently control Charles in order to place him in handcuffs without the necessity of slamming his head into the

garage several times. *See Scozzari v. Miedzianowski*, 454 F. App'x 455, 463 (6th Cir. 2012) (denying qualified immunity where the defendant "was 51 years old, 5'3' and 133 pounds, blind in one eye and hardly physically intimidating").

Charles also claims that Officer Stoneburner used excessive force by applying unduly tight handcuffing. Under Sixth Circuit precedent, "[t]he right to be free from 'excessively forceful handcuffing' is a clearly established right for qualified immunity purposes." *Meadows v. Thomas*, 117 F. App'x 397, 404 (6th Cir. 2004) (quoting *Kostrzewa v. City of Troy*, 247 F.3d 633, 641 (6th Cir. 2001)). In *Lyons v. City of Xenia*, 417 F.3d 565 (6th Cir. 2005), the court explained the contours of a claim based upon the use of handcuffs that were too tight:

> The Fourth Amendment, it is true, prohibits unduly tight handcuffing in the course of an arrest. *See Martin v. Heideman*, 106 F.3d 1308, 1313 (6th Cir. 1997); *Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993). And this general principle, it is also true, was "clearly established" under Sixth Circuit case law at the time of Lyons' arrest. *See Martin*, 106 F.3d at 1313.
> Not all allegations of tight handcuffing, however, amount to excessive force. In order to reach a jury on this claim, the plaintiff must allege some physical injury from the handcuffing, *see Neague v. Cynkar*, 258 F.3d 504, 508 (6th Cir. 2001), and must show that officers ignored plaintiff's complaints that the handcuffs were too tight, *see Burchett v. Kiefer*, 310 F.3d 937, 944-45 (6th Cir. 2002) (rejecting excessive-force claim as a matter of law where officers left defendant tightly handcuffed for three hours because defendant did not initially complain about the handcuffs, and when he did complain the officers responded promptly). *Cf. Martin*, 106 F.3d at 1313 (finding district court erred by granting qualified immunity because officers handcuffed the defendant so tightly that his hands became numb and swollen, then failed to respond to the defendant's complaints of pain until 35 minutes later).

Id. at 575-76. The court in *Lyons* held that the plaintiff failed to satisfy these requirements because she failed to allege either that the tight handcuffing caused some sort of physical injury or that she told the officers that the handcuffs were too tight. *See id.* In contrast, the court in *Kostrzewa, supra*, held that the plaintiff's allegations that officers handcuffed him too tightly were sufficient to state a claim. In particular, the plaintiff alleged that the officers ignored his complaints that the handcuffs were too small and tight for his wrists; that the officers drove recklessly while the plaintiff was in

the back seat of the patrol car in order to cause him further pain; that the officers decided to cuff him when they took him to the hospital for medical attention, even though his wrists were swollen, red, and painful; and that as a result of the handcuffing, he suffered severe and permanent injuries to both wrists. *Kostrzewa*, 247 F.3d at 640.

In this case, Charles testified that when he arrived at the police station, he asked Officer Stoneburner to loosen the handcuffs, but Officer Stoneburner did not loosen them. (Charles Smith Dep. at 37-38.) Charles remained in the handcuffs for another 25 to 30 minutes, when a deputy sheriff loosened them at the county jail. (*Id.* at 40-41.) Charles further testified that after he was released from jail, he went to the hospital, where he was diagnosed with a sprained wrist from the handcuffs and was put in a cast. (*Id.* at 41-42.) This evidence suffices to establish a Fourth Amendment claim. *See O'Malley v. City of Flint*, 652 F.3d 662, 671-72 (6th Cir. 2011). Moreover, based on clearly established law, a reasonable office in Officer Stoneburner's position would have known that his failure to respond to Charles' request to loosen the handcuffs would result in a constitutional violation. *See Solovy v. Morabito*, 375 F. App'x 521, 527-28 (6th Cir. 2010). Officer Stoneburner does not argue to the contrary.

Accordingly, the Court will deny Defendants summary judgment on this claim.

### *Donnetta's Claim*

Donnetta claims that Officer Stoneburner used excessive force by pushing her as he was reaching for Charles. Donnetta testified that as Officer Stoneburner reached out to grab Charles, she stepped in front of Officer Stoneburner and told him "not to touch [her] son." (Donnetta Smith Dep. at 38.) In response, Officer Stoneburner shoved Donnetta's shoulder with his hand as he went to grab Charles. (*Id.* at 40.) Donnetta fell onto her knees and hit the side of the house, causing some stitches in her elbow to rip. Logan was standing near Donnetta and caught her as she fell. (Logan Smith Dep. at 17.)

Viewing the evidence in a light most favorable to Donnetta, the Court concludes that she has presented sufficient evidence to establish a Fourth Amendment violation by Officer Stoneburner. Donnetta's evidence shows that she stepped in front of Officer Stoneburner as he was following Charles in order to stop him from entering her residence.  (Donnetta Smith Dep. at 40.)  Although Donnetta stepped in front of Officer Stoneburner, there is no evidence that she physically touched or threatened him.  As noted above, the criminal offense that was the subject of the officers' investigation was relatively minor and there is no evidence that this was a rapidly evolving situation that presented a risk of harm to the officers or others. *Cf. Dunigan v. Noble*, 390 F.3d 486, 494 (6th Cir. 2004) ("Officer Noble was confronted with a rapidly-evolving, highly-volatile situation which precluded the luxury of calm and reflective pre-response deliberation.  Officer Noble had no opportunity to ponder or debate his reaction to the potentially explosive situation.").  Moreover, there is no evidence in the record that Officer Stoneburner was following Charles to arrest him; instead, as Officer Stoneburner admits, he was following Charles into the house to continue his investigation.  Thus, as the homeowner, Donnetta had a right to refuse Officer Stoneburner entry into her home.  Under these circumstances, a reasonable jury could conclude that Officer Stoneburner's use of force was excessive.  Accordingly, the Court concludes that Officer Stoneburner is not entitled to summary judgment and/or qualified immunity on Donnetta's excessive force claim.

**B.      State-Law Claims**

Officers Stoneburner and Knapp argue that they are entitled to summary judgment on Charles' and Donnetta's state-law claims of assault and battery, false arrest, and false imprisonment on the basis of governmental immunity.  Under Michigan law, a defendant is entitled to governmental immunity for an intentional tort if the defendant establishes that he acted in good

21

faith.[6] *Odom v. Wayne Cnty.*, 482 Mich. 459, 480, 760 N.W.2d 217, 228 (2008).  "Good faith" is

a subjective test, under which a defendant is subject to liability only if he acted with "malicious

intent."  *Id.* at 482, 760 N.W.2d at 229.

Based on the evidence in the record, the Court cannot say as a matter of law that Charles and

Donnetta fail to present any evidence refuting Officers Stoneburner's and Knapp's assertions that

they acted in good faith.  Although Charles and Donnetta have not presented evidence of any

statements by Officers Stoneburner or Knapp indicating that they acted with malice, *see Dixon v.*

*Cnty. of Roscommon*, No. 11-1127, 2012 WL 1522320, at *3 (6th Cir. May 2, 2012) (per curiam)

(observing that evidence the defendant deputies made statements such as "You wanna play some

more? Huh?" and "Come on stupid, let's go." sufficed to create an issue of fact regarding the

defendants' good faith), in the Court's judgment, Charles and Donnetta have presented sufficient

evidence to create an issue of fact as to whether Officer Stoneburner and Officer Knapp acted in

good faith.  For example, as the Court has already found, Officer Stoneburner unlawfully entered

the Smiths' house in order grab Charles, resulting in an unlawful arrest.  Charles has also presented

evidence tending to show that Officers Stoneburner and Knapp used excessive force while

attempting to handcuff him. Similarly, Donnetta has presented  evidence supporting her claim that

Officer Stoneburner used excessive force against her.  In *Odom*, the Michigan Supreme Court

observed that its cases had described willful and wanton misconduct as conduct demonstrating "an

intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent

of a willingness that it does." *Odom*, 482 Mich. at 475, 760 N.W.2d at 225 (internal quotation marks

omitted).  Given Charles' and Donnetta's evidence, a reasonable jury could conclude that the

_____

[6]A defendant must also show: (1) that his acts were undertaken during the course of employment and he was acting, or reasonably believed he was acting, within the scope of his employment; and (2) the acts were discretionary, as opposed to ministerial.  *Odom*, 482 Mich. at 480, 760 N.W.2d at 228.  Neither of these elements is subject to dispute in this case.

officers acted in bad faith, or with malice, based on a reckless disregard of Charles' and Donnetta's rights. Thus, the officers' motion will be denied with regard to the state-law claims.

Charles and Donnetta contend in their motion for summary judgment that they are entitled to summary judgment on their state-law claims. Because the Court concludes that the officers' good faith presents an issue of fact for the jury, Charles and Donnetta have failed to establish that they are entitled to summary judgment on their state-law intentional tort claims.

## IV. Conclusion

For the foregoing reasons, the Court will deny Defendants' motion for summary judgment as to all claims. The Court will grant the Smiths' motion for summary judgment on the second unlawful entry claim and deny it as to all other claims. Finally, the Smiths' claims against the City and against Officer Stoneburner for failing to intervene will be dismissed.

An Order consistent with this Opinion will be entered.


Dated:  July 23, 2012                                  _____/s/ Gordon J. Quist_____
                                                                    GORDON J. QUIST
                                                          UNITED STATES DISTRICT JUDGE